MORRIS J. LOXLEY, PLAINTIFF, AND PLAINTIFF IN ERROR, v. CLEMENT STUDEBAKER ET AL., DEFENDANTS, AND DEFENDANTS IN ERROR.

Argued June 20, 1907—Decided November 18, 1907.

1. When a broker is employed to sell real estate at a fixed price before a certain date, his agency expires at the date, and he is not entitled to commissions unless, before the arrival of this date, he has found a purchaser able and willing to buy on the terms fixed in the employment, or unless the employer, by fraudulent conduct, has defeated the efforts of the agent to effect a sale. The sale of the property, after the termination of the broker's agency, by the owner to a purchaser with whom the agent had been in negotiation during the period of his employment, does not entitle him to commissions.

2. A written contract was entered into by which a broker was given an exclusive right to sell real estate at a fixed price before a certain date. *Held*, that the trial court rightly excluded an offer to show that at the time of the execution of this contract the defendants told the plaintiff that if a sale satisfactory to the defendants was effected by the broker after the expiration of the written contract the defendants would pay the broker his commissions.

On error to the Supreme Court.

For the plaintiff in error, *Robert H. McCarter,* attorney-general.

For the defendants in error, *Pitney, Hardin & Skinner.*

The opinion of the court was delivered by

REED, J. This writ of error brings up a judgment of nonsuit. The action was brought to recover commissions for the sale of a gas plant situated at South Bend, Indiana. The gas plant was the property of the South Bend Fuel and Gas Company. The defendants controlled and, with their family connections, owned the stock of the company. The plaintiff is a broker, having an office in Philadelphia.

On April 15th, 1903, Mr. Loxley, the plaintiff, wrote to Mr. George M. Studebaker, one of the defendants, asking him if he would consider a sale of the gas plant, and stating that the parties that he, Mr. Loxley, represented were amply able to purchase if the price and terms were satisfactory to them. He also suggested that he should visit South Bend. Mr. Studebaker, by telegram, advised him not to come.

On October 31st, 1903, Loxley wrote again to Mr. Studebaker, asking him if he would sell, and telling him that the gentlemen who would consider the purchase were Bertrom & Storrs, 40 Wall street, New York. He also said he would be glad to go to South Bend, and would like to have some figures as to the gross and net income and operating expenses of the plant. The answer to this letter was not produced, but on November 12th Loxley wrote, saying he would visit South Bend and get the data and talk over matters. On November 17th he was told to come.

On November 17th Bertrom & Storrs wrote to Loxley, enclosing a paper containing questions respecting the gas property which they wished the owners to answer.

On December 1st Loxley wrote to Clement Studebaker, stating that he had had a conference with Bertrom & Storrs, and that they were awaiting information.

On December 5th Clement Studebaker wrote that they would be able to send the information on the first of the week, and stating that they would not be willing to consider anything but a cash offer at the figures named.

In the meantime Loxley had visited South Bend and had had an interview with C. Studebaker, and made some memoranda, and got a statement that the company would accept $400,000 for the stock of the company. Nothing was said about commissions. This information was communicated to Bertrom & Storrs.

On December 12th Loxley wrote the gas company, saying that pending the arrival of detailed information Bertrom & Storrs were arranging to send their confidential engineer to examine the physical condition of the gas plant.

On March 2d, 1904, Bertrom, Storrs & Griscom (the latter being a lately admitted member of the firm) wrote to Clement Studebaker, Jr., conveying an offer to purchase. The terms offered were $750,000, the present bonds to remain outstanding, and to be deducted at their par value from this purchase price.

On April 9th Mr. Studebaker replied that they would not consider anything but a cash offer. Other unimportant letters were interchanged under dates of June 3d, 11th and 17th.

On June 16th C. Studebaker enclosed a statement of their gross and net income, operating expenses, and expenses for improvements and for a new site. He also called attention to the fact that they had bonds to the amount of $450,000 outstanding, instead of $500,000, and conveys other now unimportant information.

On June 20th C. Studebaker, Jr., sent Loxley, by his request, a report by Haskins & Sells on the affairs of the company for 1902 and 1903, the acceptance of which report is acknowledged June 23d.

On June 28th Loxley enclosed a letter from one Frank Tilford, making a cash offer for the bonds of the company. This offer was withdrawn by letter July 13th. In this letter Loxley states that he believes he could sell the plant if they would take $375,000 for the stock, less his commission of three per cent.

On July 19th the gas company made a proposition to sell for $400,000 net to them.

On July 21st Loxley wrote to Bertrom, Storrs & Griscom thus: "After a great deal of hard work, I have gotten those South Bend people to quote me a price for $400,000 for the stock of the plant, subject to the bond issue for $450,000, and not $500,000, as quoted you by them."

On July 22d Bertrom, Storrs & Griscom wrote to Loxley, declining the offer, which letter Loxley forwarded to the gas company in a letter of his under date of July 23d. In the last letter Loxley asserted his ability to sell the gas company stock for $365,000, subject to the bond issue of $450,000,

upon the verification of the figures furnished by Loxley obtained from the gas company.

So far it is perceived that Loxley was acting for some proposed purchaser, and not acting as a broker for the gas company.

In answer to his suggestion contained in the letter of July 13th that he could sell the plant for $375,000, less his three per cent. commission, he was plainly told that the company's terms were $400,000 net.

On July 28th, 1904, the gas company wrote a letter which conferred upon Loxley the exclusive right to sell the stock, treasury bonds and real estate of the gas plant, that exclusive right to terminate on December 1st, 1904. By a confirmatory letter of the same date, the lowest price at which the sale could be made was fixed at $365,000 cash, the company agreeing to pay three per cent. commission on the price, as well as on the amount of stock which the gas company should receive, at the value that it received it. A right was granted Loxley to receive commission from the purchaser.

By letter of August 17th, 1904, the terms contained in the letter of July 17th were confirmed, and the gas company agreed that commissions should be paid upon the aggregate amount of bonds outstanding, plus the price received for the stock.

After November 15th the correspondence displays a variety of offers for options to purchase given to different parties, none of which were accepted by any one of them.

On November 15th, 1904, Loxley wrote to C. Studebaker, and, after speaking of these fruitless negotiations, said: "I have advised you of an offer of $300,000 cash for all the stock, subject to the usual examination of statements and figures. I believe it is the best price that will be offered."

C. Studebaker, Jr., replied that if the amount of cash was raised to $325,000, after commissions were paid, he might induce the company to accept it, but it was doubtful. He also reminds Loxley that his time for making a sale would expire on December 1st.

On November 22d Loxley requested the gas company to renew his exclusive right to sell for three months longer, namely, until March 1st, 1905. On November 25th the company wrote that it would not accede to this request, but would extend the time to January 1st, 1905, which proposition was accepted by Loxley.

On December 1st, 1904, the company, on the strength of a letter from Loxley, reduced its cash price from $325,000 to $315,000. On December 14th Loxley calls attention to the last offer from Bertrom, Storrs & Griscom of $100,000 in cash, $100,000 preferred ·stock and $100,000 common stock, but says that he.does not know that this price can now be obtained from them. The gas company refused to consider this offer by letter of December 24th, reminding Loxley that his option expired January 1st, and that if he was not able to do business with Kleybolte & Company (a firm mentioned in a preceding letter from Loxley) the company would prefer that he, Loxley, would stop any further negotiations. The company also requested him to return the statement and other data which they had sent him.

On December 29th, 1904, Loxley wrote that he would keep the papers until he had concluded the negotiations with Kleybolte & Company, for whom one Bylles seems to have been making an examination of the gas plant.

On January 7th, 1905, C. Studebaker wrote Loxley that he could wait but a few days longer to know the intentions of .Kleybolte & Company, and asked Loxley to return all papers not later than the last of the week.

On January 13th Loxley wrote that as soon as Kleybolte & Company returned to him the papers he would forward to the gas company.

On January 14th C. Studebaker, Jr., wrote that if they did not hear from Loxley concerning the Kleybolte & Company negotiations some time during the next week the matter would be closed, and that they did not wish Loxley to negotiate with anyone whatsoever for.the sale of the plant. He added: "As you know, your option·expired on the 1st of

January, and you have no authority from us to further negotiate for the sale of the plant."

On January 21st C. Studebaker, Jr., wrote Loxley, acknowledging the receipt of some documents, and asked the return of a map. On January 30th Loxley advised C. Studebaker, Jr., that Kleybolte & Company refused to purchase. He further wrote: "If, after further consideration of this business, you care to have me approach Bertrom, Storrs & Griscom again, advise me, and I will do so."

On February 1st C. Studebaker, Jr., wrote Loxley: "I do not care to have you take this up with Bertrom, Storrs & Griscom, as you say they would not make any better proposition, and we are not willing to accept the proposition which they made to us."

On February 6th Loxley sent another proposition from Bertrom, Storrs & Griscom. On February 8th the company wired Loxley they could not consider the proposition, and that they did not wish him to offer the property further. On February 8th Loxley wrote to Bertrom, Storrs & Griscom: "I have just received information to the effect that in about two weeks I can offer you the stock of the South Bend Fuel and Gas Company at about the price you offer for same. I am bringing some pressure to bear on the Studebakers, and hope they are going to have another lesson in reduction." In the same letter he calls their attention to another purchasable gas plant.

On February 9th, 1905, Loxley wrote to George M. Studebaker thus: "Confirming conversation had with you yesterday in New York, I beg to thank you for your promise to advise me when your present negotiations are concluded. If they do not result in a sale, I believe it probable that I can be of further service to you in disposing of your property."

On February 7th George M. Studebaker wrote Loxley thanking him for the receipt of a report.

On February 20th Loxley wrote to the Studebakers that if the property was still unsold he had some interesting negotiations with a banking-house in New York. On February 23d George M. Studebaker wrote that "it looked like they had a

deal on hand now that would go through, and that if it did not go through they had made up their minds they would handle the property themselves."

On March 31st Loxley wrote that he was glad to learn that the company was continuing negotiations with Bertrom, Storrs & Griscom, and asked the company to protect him in a cash commission of $25,000, and on April 17th George M. Studebaker replied "that they did not feel themselves under any moral or legal obligation to pay him a commission." It appears that the company had sold the plant to Bertrom, Storrs & Griscom.

It thus appears by the letter of July 28th, as confirmed and modified by letter of August 27th, 1904, that Loxley was invested with an exclusive right to sell the gas plant for a fixed price before December 1st, 1904, the period being afterward extended to January 1st, 1905. It also appears that within the period mentioned Loxley did not sell the plant or obtain a purchaser willing and able to pay the price named in the contract, or indeed for any less price which was acceptable to the company. The condition upon which the plaintiff was to receive anything under the contract was never performed by him, and upon this ground he was nonsuited at the trial. When a party stipulates that the agency to sell property is limited to a definite period it terminates at the expiration of that time, unless the broker has found a purchaser able, ready and willing to buy the property within the time specified. 19 *Cyc. L. & P.* 254.

In *Crowley Company* v. *Meyers,* 40 *Vroom* 245, the plaintiff was permitted to recover because a binding contract was actually entered into by the broker within the period limited by the terms of his employment.

Mr. Mechem says: "The point is to ascertain—*first,* what did the broker undertake to do? *second,* has he completed that undertaking within the time and upon the terms stipulated? *third,* if not, is the default attributable to his own act or to the interference of the principal?" He then proceeds to say: "It will be seen from this rule that where the time is limited the performance must be within that time, and the

broker will not be entitled to commissions, because efforts taken within that time bore fruit after its expiration." *Mech. Ag.*, § 965.

Where the principal defeats the efforts of the broker by fraud that fact removes the case from the general rule. If the principal should secretly induce a purchaser to withdraw an offer made within the stipulated period, or should unreasonably refuse to accept a responsible purchaser, such conduct would amount to fraud.

There is absolutely nothing in this case to show that any obstacle was thrown in the way of the plaintiff. On the contrary, he was assisted in his efforts to effect a sale, even to the extent of a reduction in the price to be paid.

The fact that the principal, after the expiration of the limited period, sold to a purchaser with whom the broker had been in negotiations during the period, does not constitute fraud. *Satterthwait* v. *Vreeland*, 48 *How.* 508; *Page et al.* v. *Griffin*, 71 *Mo. App.* 524; *Fultz* v. *Wimer*, 34 *Kan.* 576; *Farrer* v. *Brodt*, 38 *Ill. App.* 617; *Wilson* v. *Sturges*, 71 *Cal.* 226; *Zeimer* v. *Antisell*, 75 *Id.* 509.

The reason is manifest. When the broker has failed to perform the condition upon which he was to be paid, there is an end to the contract. All contractual obligations of the owner toward the broker are terminated. The parties stand as if a contract had never been made. The market for the sale of the owner's property is not circumscribed by the fact that some or all available purchasers have theretofore been approached by the broker. The world is open to the owner to sell to whomsoever will buy, upon whatever terms he pleases. No right can thereafter accrue to the broker save under some new contract of employment, express or implied. No right of commissions can spring out of any act done by the broker while the original contract was in force.

Even where no time is limited in the contract, yet where the principal in good faith terminates the agency and seeks other assistance by means of which a sale is effected, the fact that the purchaser was one introduced originally by the first broker does not entitle the latter to commissions. *Wylie* v.

*Marine National Bank,* 61 *N. Y.* 415; *Sibbald* v. *Bethlehem Iron Co.,* 83 *Id.* 378; *Antisdel* v. *Canfield,* 119 *Mich.* 229; *Stedman et al.* v. *Richardson,* 100 *Ky.* 79.

In so far, therefore, as the plaintiff seeks to stand upon the written contract of August 17th, his claim for commission has no legal footing.

It is, however, insisted that the trial judge erroneously excluded testimony which, in the language of the offer, would show that on August 17th, 1905, both of the defendants told the plaintiff that if a sale was effected by him, satisfactory to them, of this property, even after the time the option or exclusive right expired, that they were honorable men, and would pay his commission.

The counsel for the plaintiff insists that this offer of parol testimony was concerning something collateral to the subject-matter of the written contract, and was therefore admissible. The date fixed was that upon which the final written agreement between the parties was signed by the defendant—the agreement which confirmed the former letter of July 28th, in which the plaintiff was given the exclusive right to sell, and then first fixed definitely the rate of commission. The written paper signed upon that date appears upon its face to be complete. It is presumed to contain all the terms by which the parties wished and intended to bargain.

The insistence is that the parol testimony proffered was to show a collateral and distinct agreement, the alleged distinction being that the written agreement dealt with an exclusive authority to sell, while the parol agreement dealt with an authority, not exclusive, but to be in common with the authority of the owner and any other broker he wished to employ.

The parol offer was clearly inadmissible unless it concerned a matter not only collateral to but distinct from the matter included in the written contract. In no jurisdiction is this wholesome rule more strictly enforced than here. Nor does the fact that the matter covered by the oral agreement is in a popular or general sense distinct render it admissible, for it may be said that every matter upon which a written

agreement is silent is a matter distinct from that included in the writing.

The case of *Naumberg* v. *Young,* 15 *Vroom* 331, 341, was decided twenty-five years ago, and the opinion of Mr. Justice Depue has ever since been regarded as a sound and accurate statement of the position of our courts upon this question. Upon the point now mooted this language was employed: "Nor can this salutary rule of evidence which is indispensable to the security of the contracting parties, be maintained in its integrity in the admission of oral testimony in relation to matters which in a general sense might be considered as collateral to the contract. An exception of such a compass would in a great variety of cases entirely displace the rule and make it of little value. To justify the admission of a parol promise by one of the contracting parties to a written contract, on the ground that the promise was collateral, the promise must not only be collateral, but must relate to a subject distinct from that to which the written contract applies." The learned justice illustrates by saying "that a warranty of the quality of property is collateral to the sale, for the title will pass without such a warranty; but when such an undertaking is entered into, it will form part of the contract by the agreement of the parties. *Benj. Sales* 452. Hence, when a contract of sale has been reduced to writing, parol evidence is inadmissible to add a contract of warranty to the terms of the contract as expressed in the writing."

This rule was specifically applied by the Supreme Court in the case of *Bandholtz* v. *Judge,* 33 *Vroom* 526, and *Church of the Holy Communion* v. *Paterson, &c., Railroad Co.,* 34 *Id.* 470, and by this court in *Hallenback* v. *Chapman,* 43 *Id.* 201.

The subject of the written contract in this case was the employment of the plaintiff as a broker. The contract fixed the extent of his authority and the period during which it should exist. The proffered parol agreement extended the time during which his employment should last and modified the authority of the broker during the extended period. It was similar to an offer by a tenant to show that when a writ-

ten lease was executed for a certain term it was verbally agreed that he should remain in possession after the end of the term at half rent.

In neither of these instances is the subject-matter distinct. There was no error in the ruling of the court in excluding the offer.

If, however, the parol agreement had been admitted, it is not perceived how it would have bettered the position of the plaintiff. The agreement would have fixed no period of time for its continuance. The defendants would have had the right to revoke it in good faith at any moment. There is not a scrap of evidence that, when before and after January 1st the defendants warned the plaintiff to discontinue all negotiations, they had any intention or notion of selling the property to Bertrom, Storrs & Griscom. If, therefore, the parol contract had existed, it was revoked at the time of the termination of the written contract in respect to all negotiations, with the exception of the pending negotiations with Kleybolte & Company, which the defendants permitted Loxley to bring to a conclusion.

The plaintiff was repeatedly told that he had no authority to further negotiate for the sale of the property. In no letter did he claim any such authority to further act for the defendants. When he thereafter approached Bertrom, Storrs & Griscom he did so, not as the broker of the defendants, but as one operating in his own interests, or in the interests of the proposed purchaser. He wrote to Bertrom, Storrs & Griscom, "I am bringing more pressure to bear upon the Studebakers and hope they are going to have another lesson in reduction."

This language is entirely inconsistent with any assumption that he was then acting for the Studebakers. After the termination of the original contract he obtained no purchaser by virtue of any new employment by the defendants, and, as already remarked, the fact that he had come in touch with them during the period of the original employment, gave him no right to commission.

The judgment of nonsuit should be affirmed.

*For affirmance*—MAGIE, CHANCELLOR, THE CHIEF JUS-
TICE, GARRISON, HENDRICKSON, PITNEY, REED, TRENCHARD,
VREDENBURGH, GREEN, GRAY, DILL, J.J.     11.

*For reversal*—None.