151 N.J. Super. 115 (1977)
376 A.2d 585
HARRY W. FRY, T/A H.W. FRY REALTY COMPANY, PLAINTIFF,
v.
WILLIAM J. DOYLE, INDIVIDUALLY AND T/A WILLIAM J. DOYLE ENTERPRISES AND ELIZABETH F. JUNG, INDIVIDUALLY, SEVERALLY, AND IN THE ALTERNATIVE, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided May 31, 1977.
*118 Messrs. Miller, Myers, Matteo & Rabil, attorneys for plaintiff (Mr. John L. Miller appearing).
Messrs. Hartman, Schlesinger, Schlosser & Faxon, attorneys for defendant Doyle (Mr. Jan Schlesinger appearing).
*119 Mr. James Logan, Jr. attorney for defendant Jung (Mr. Jeffrey Clark, appearing).
WELLS, J.C.C., Temporarily Assigned.
Plaintiff realtor sues defendants Doyle (buyer) and Jung (seller) for commissions allegedly due on the sale of 64 acres of land situate in Westhampton Township, Burlington County, New Jersey. The facts are largely undisputed, but the inferences to be drawn from the facts in light of the legal framework of the transaction give rise to the issues to be resolved.
On June 1, 1971, as the result of plaintiff's services, defendant Jung and C.W. March Realty Co., Inc. (hereinafter referred to as March), as buyer, entered into an option by which March secured the right to buy Jung's 64 acres of land on or before September 1, 1971, and for three successive one-year periods thereafter. March extended the option for each such period to its final expiration date of September 1, 1974. If and when exercised the option became a binding agreement of sale for the land at increasing prices per acre ($8,000 an acre from September 1, 1973 to September 1, 1974), and required March to pay 29% down in cash at settlement 60 days after exercise of the option and give Jung a note and mortgage for the balance payable in two equal annual installments at 7% interest.
In an addendum to the option Jung agreed to pay plaintiff a commission of 10% on the "gross sale price or any part thereof." The addendum did not contain a provision for commissions in the event of a post-expiration sale between the parties to the option. Since plaintiff had no listing agreement, the aforesaid addendum is the sole contractual basis of plaintiff's claim. In an entirely unrelated transaction in 1973 defendant Doyle lent March $100,000 secured by an assignment of March's interest in the option on Jung's land. March defaulted on the loan and on June 18, 1974, 2 1/2 months prior *120 to expiration of the option, Doyle took over March's position as optionee.
When March told Jung that he could not pick up the option, she, at March's suggestion, went to see Doyle. At a meeting in July 1974 Doyle offered Jung at least four alternate proposals for either purchasing or reoptioning the property. One of the purchase proposals was for a price of $7250 an acre, with cash down of $50,000 and a note and mortgage at 7 1/2% for the balance payable in ten years. Mrs. Jung testified credibly, in the court's opinion, that she rejected the above proposal and all the others as well. The price was below what March had agreed to pay and what neighbors had received for their land. Mrs. Jung testified as follows:
Q What was the purpose of your going to his office? How did you come to go there?
A Well, I went to see  I saw Mr. March and he told me he was not going to buy the property; that, I guess, he was broke or something. He said he couldn't buy the property.
So I said, well, I think I will have to get somebody else then; and he referred me then to somebody in the Levitt Building, and it was Mr. Doyle, and I spoke with him then.
Then he did make an offer, but I didn't think it was enough; but being that I was so sick, later on, when I reconsidered that I was there all alone in Barnegat and my son was up in New Orleans  he is a space engineer up there  that I thought it would be better just to sell than to be over here and be sick. * * *
That was the first time I saw Mr. Doyle, and I wasn't satisfied with the price because Mr. March had offered me quite a bit more. And my friend over there, she had gotten $10,000 an acre from Mr. March.
But being sick, as I say, I lost two brothers and a sister and my nephew, a 10-year-old boy, within six months, and I was besides myself. I had nobody else but my son.
I had been a widow for 25 years, and I was there alone and deathly sick. They didn't expect me to live. I lost 35 pounds in 30 days. * * *
THE COURT: Let me ask you this: In relationship or or after your visit to Mr. Doyle's Office, when did you get sick after that?
THE WITNESS: I was sick, oh, I got awfully sick because I got sick worrying from all this ahead of time and got sicker right along.
*121 THE COURT: I see.
THE WITNESS: And I lost my brother that was living with me, and I was alone then.
As I say, I am a widow for 25 years, and I was on this farm. I raised 1000 chickens a year and I raised calves to get the mortgage off the property that I had; and I was pretty well tired out.
When all this happened so suddenly, it just affected my heart and I got rheumatism and all and I couldn't just stay there by myself in Barnegat.
At about the same time Doyle ordered the survey of the property checked against the description in the option and engaged two brokers to informally appraise the land and the option itself. To one of them he gave a five-month nonexclusive listing for the property at an asking price of $1,200,000. Through Doyle's attorneys Jung's attorneys were notified that Doyle "fully intended to exercise the option."
Both of Doyle's brokers gave discouraging reports on the value of the option and general market conditions for the ground itself as zoned. Furthermore, the court believes that Doyle himself never considered picking up the option as written, requiring as it did three very large cash payments in as many years. Doyle testified that from a cash flow standpoint he could not afford the transaction as structured in the option and testified that he did not agree until "she [Jung] agreed on the price." True, there is some evidence that this could have been at that July 1974 meeting, but the court concludes from all the circumstances that Mrs. Jung did not "agree on the price" until early October 1974, more than one month after the expiration of the option. Doyle had not pushed or hounded her about it; rather, the pressure of her own lonely circumstances and ill health finally caused her to agree.
This suit arises out of the fact that 40 days after the option expired Doyle and Jung entered into an agreement for the sale of the property on terms essentially similar to one of those Doyle proposed in July 1974 (the one described above) and immediately made settlement.
*122 Plaintiff, apparently aware of Doyle's assumption of the option, signalled his claim for commissions, and Jung and Doyle entered into a side agreement to share the commissions in the event they were found due.
Plaintiff argues three theories of recovery of its commissions on the above facts: (1) the option was, in fact, exercised; (2) even if the option expired, by analogy to a listing agreement plaintiff should recover because it was the efficient cause of bringing buyer and seller together within the option period, and (3) Doyle and/or Jung tortiously interfered with plaintiff's right to commissions.
There is no question that the option was not exercised. The option specified how exercise was to be accomplished.[1] Where an option specifies the manner it is to be exercised such terms must be strictly adhered to. 51 (C) C.J.S. Landlord and Tenant § 82; 77 Am. Jur.2d, § 40. Doyle did not exercise the option in the manner prescribed. Checking the survey, listing the property, indicating he fully intended to exercise the option, making alternate proposals to Mrs. Jung, cannot constitute de facto exercise in the face of a clear written provision. Such acts are mere incidents of holding an unexercised option and are not "indicia of ownership" inconsistent with Doyle's position as an optionee. Certainly in deciding whether to exercise, an optionee has the right to appraise the property, to insure himself as to the accuracy of the description and to try to negotiate for purchase and sale of the property covered by the option on favorable terms without committing himself to picking it up. Indeed, since it was not his opinion to begin with, Doyle acted entirely reasonably, doubtless with a view to sizing up what he had and turning it over quickly to recoup his own loss.
*123 The central contention in this case is, in effect, that an option, like a listing agreement, has a life beyond itself, and protects a broker's commissions in the event of a post-expiration settlement between the original parties. But a listing agreement is a form of agency agreement and employment in which the agent agrees to expose a property to the market in consideration of payment of his commission if a sale is made. See Generally 51 A.L.R. 3rd 1149. But cf. Barry Norman Agency v. Elias, 117 N.J. Super. 480 (Law Div. 1971). Here, plaintiff's contract for commissions was appended to a specific, time-limited, irrevocable offer to sell land on specific terms to a specific buyer. Cf. State v. N.J. Zinc Co., 40 N.J. 560, 576 (1963). It, in effect, removed Jung's property from the market and bound her to a prospect who, by very definition, was neither ready, willing and, as it turned out, able to buy. Cf. Ellsworth Dobbs, Inc. v. Johnson, 50 N.J. 528 (1967).
Plaintiff's claim to commissions can rise no higher than the instrument to which it is appended and it is by no means clear that the law protects brokers' commissions after the expiration of an option. Compare Freeman v. Kinston Mfg. Co., 233 F. 58 (4 Cir.1916); Dreyfuss v. Lund, 217 A.2d 662 (D.C. App. 1966); Consolidated Realty Co. v. Graves, 291 Ky. 456, 165 S.W.2d 26 (Ct. App. 1942); Rosenblum v. Lurie, 128 Pa. Super. 480, 194 A. 204 (Super. Ct. 1937); Cotten v. Willingham, 232 S.W. 572 (Tex. Civ. App. 1921), where brokers won commissions in a variety of fact situations, with Scott v. Huntzinger, 148 Colo. 225, 365 P.2d 692 (Sup. Ct. 1961); Plumbing Industry Program, Inc. v. Good, 120 So.2d 639 (Fla. Ct. App. 1960); Dunson v. Huntley, 135 Ga. 465, 69 S.E. 707 (Sup. Ct. 1910); Saunders v. Hackley & Hume Co., 208 S.W. 67 (Mo. 1918), where commissions were not awarded. See generally, Annotation, "Broker's Right to Commission from Principal Upon Procuring Third Party Taking an Option," 32 A.L.R.3d 321 (1970). Gleaning these cases for the principles on which the varying results rest, I find four in number: (1) the *124 presence or absence of a listing agreement or broker's employment contract and, if any, the terms thereof; (2) proof of bad faith amounting to fraud on the broker; (3) consideration of the broker as the efficient cause of the sale, and on this issue the following facts have been deemed important: (a) the time between the expiration of the option and the sale, (b) whether there has been a "break" in negotiations after the lapse of the option, and (c) the differences in the option terms if exercised and those of the actual later sale; and (4) policy considerations.
None of these principles are foreign to New Jersey law in suits by brokers against buyers and sellers for commissions, but the court has found no case applying them to an expired option situation. To consider the facts of this case in light of these principles the court finds that plaintiff had no listing agreement or general employment contract. His compensation agreement was appended to an offer to sell which by its terms could and did expire. Plaintiff's commission addendum does not preserve his commission under the lapse of the option. In Brenner v. Perl, 72 N.J. Super. 160 (App. Div. 1962), the court held there was no right to a commission in the case of a sale after lapse of a listing agreement where it required sale before it expired. But such a provision is analogous to a commission agreement appended to an option. In the absence of a specific provision to the contrary, the contract for commissions expired with the option. The Brenner court said:
A realty broker only earns his commission when, pursuant to a written agreement, he produced a buyer, able and willing to purchase on terms satisfactory to the owner. Hedden v. Folio, 62 N.J. Super. 470, 474 (App. Div. 1960); Mack v. Revicki, 47 N.J. Super. 185, 192 (App. Div. 1957); Restatement, Agency, § 446, p. 351 (2d ed. 1958). The agreement under consideration is clear and unambiguous. It provided that a commission would be earned only if a sale was arranged before the expiration of the agency contract. When the agent's employment terminated, the parties stood as if the contract had never been made. The market for the sale of the owner's property is not circumscribed by the fact that an available purchaser *125 had previously been approached by the broker. Loxley v. Studebaker, 75 N.J.L. 599, 606 (E. & A. 1907).
Secondly, plaintiff has charged bad faith, although he has couched it in terms of tortious interference with contractual relations. See Sustick v. Slatina, 48 N.J. Super. 134 (App. Div. 1957); Beckmann v. Charles H. Reid & Sons, Inc., 44 N.J. Super. 159 (App. Div. 1957). Based on the circumstantial evidence that (1) the difference between the option price and the amount of the agreed price is about the amount of the commission; (2) Doyle could not specify what the basis of his offer to Mrs. Jung was; (3) documents were destroyed, even after the parties knew of plaintiff's potential claim; (4) the proposal made in July was the one settled on in October without further negotiations, and (5) the parties entered into an agreement to split the commissions, if payable, plaintiff argues that Jung and Doyle agreed in July to cut the price 10% and hold settlement after September 1, 1974, partially indemnifying themselves if plaintiff had to be paid.
But these circumstances overlook the clear inference that Doyle's initial enthusiasm for the "security" he had just obtained waned. He saw the huge cash requirements of the option and realized that concessions as to price and terms would have to be secured from Jung in order to pick up the option with any hope of later making a profit and recouping his loan loss. He thereafter made proposals to her which indeed shaved the price, but more importantly substantially reduced the cash requirements. When these offers met with rejection Doyle had no choice; the option went unexercised. There was no attempt here to deal behind plaintiff, as in the case of Harris v. Perl, 41 N.J. 455 (1963).
By listing the property Doyle sought to test the market for a turnover sale which would allow him to get out whole. By offering alternatives to Mrs. Jung he attempted to protect his own interest and reduce the cash needed for settlement  all of this within the option period and all directed *126 at exercising it, not letting it expire. He failed. While the aforementioned circumstances do give rise to an inference of fraud or bad faith, examination of the whole situation leads me to conclude that the probabilities are against it. One key factor in this conclusion is the court's belief in Jung's testimony.
Nonetheless, plaintiff might yet recover if he were the efficient cause of the sale. True, the option date and sale were separated by only 40 days, but there had been no negotiations since July 1974 and the terms finally agreed on were entirely different from those of the option. What brought Jung and Doyle together finally was Jung's submission to her own personal problems. Plaintiff had nothing to do with those forces or the shape of the final arrangement. Indeed, conceding Doyle was produced as an indirect but proximate result of plaintiff's services, he was never able to buy in the financial sense within the period of the option. Ellsworth Dobbs, Inc. v. Johnson, 50 N.J. 528 (1967).
The Kentucky court in Consolidated Realty Co. v. Graves, 291 Ky. 456, 165 S.W.2d 26 (Ct. App. 1942), held as a policy matter that not to allow commissions in this situation would be to lay open the way for owners to deprive brokers of justly earned deserts. But the policy in New Jersey is expressed by the principle that a broker's commission is not earned until he finds a buyer, ready, willing and able to buy. Ellsworth Dobbs, Inc., supra. In this case neither March nor Doyle were such buyers within the period of the option of which plaintiff's contract was a part. He thus cannot collect.
For the reasons stated the court finds no cause of action in favor of defendants and against plaintiff.
NOTES
[1] "If the Buyer desires to exercise the said option and shall, within the said period, so notify the Seller in writing, which notice may be served personally upon the Seller or left at the Seller's dwelling house or usual place of abode or be sent by mail, addressed thereto, within such period * * *."