not to return an indictment for that crime under *N.J.S.A.* 2C:11–4(a).

We affirm the dismissal of the indictment brought under *N.J.S.A.* 2C:11–4(b)(1) without prejudice to the State to seek an indictment under *N.J.S.A.* 2C:11–5.

ROBERT AND RICHARD ASSOCIATES, PLAINTIFF-RESPONDENT, v. THE STATE OF NEW JERSEY, DIVISION OF PURCHASE AND PROPERTY, DEFENDANT-APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued April 24, 1985—Decided July 2, 1985.

Before Judges MATTHEWS, FURMAN and HAVEY.

*Eugene J. Sullivan,* Assistant Attorney General, argued the cause for appellant (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney; *Michael R. Cole,* Assistant Attorney General, of counsel, *Eugene J. Sullivan* and *Joan Robinson Gross,* Deputy Attorney General, on the brief).

*Kevin J. Coakley* argued the cause for respondent (*Connell, Foley & Geiser,* attorneys; *William O. Pessel, Jr.,* on the brief).

The opinion of the court was delivered by

MATTHEWS, P.J.A.D.

The facts material to the narrow issues raised on this appeal are largely undisputed.

By agreement dated July 12, 1967, the State leased an office building to be built in Trenton by plaintiff. The lease term was for 20 years, commencing on January 1, 1969, unless the building was not completed by that date, in which case the term was to begin on the first day of the month next following delivery of the building to the State.

Paragraph twenty-fifth of the lease granted the State an option to purchase the land and building:

> It is mutually covenanted and agreed between the parties hereto that during the *eleventh year of the within lease, the Lessee herein shall have the option to purchase* the land and building containing approximately 200,000 square feet so erected thereon, of the premises herein leased at the just and true market value at that time which value shall be ascertained in the manner hereinafter provided.

*In order to ascertain the value of the lands and building* then erected on the demised premises, the owner and Lessee shall each nominate one fit, competent and impartial real estate appraiser to value and appraise the fee simple true market value of such land and buildings which such nomination shall be made and signified by each party to the other within one (1) month after receipt of notice of Lessee's intent to exercise the option hereunder, and if the two persons so nominated and appointed by each of said parties shall differ in judgment as to the fair market value, they shall within one month from the date of the last appointment mutually appoint a third fit, competent and impartial real estate appraiser to act as an umpire between them. In the event that they cannot agree on such umpire during said period, then each party shall no later than 10 days thereafter nominate two fit, competent and impartial real estate appraisers and from the names of the four persons so nominated, one shall be designated by the then sitting assignment judge in and for the County of Mercer, who shall be such umpire; and the decision of such persons or in the case of their disagreement, of the said umpire together with any one of the other appraisers so nominated shall be final and conclusive. Said final decision will be made within 20 days after appointment by said assignment judge.

*In no event, however shall the aforesaid option price exceed the sum of SEVEN MILLION NINE HUNDRED THOUSAND DOLLARS ($7,900,000.00).*

*Notice of the Lessee's intention to exercise the above option shall be given to the Lessors at least 180 days prior to the commencement of the eleventh year of the within lease.*

*If the Lessee shall fail to exercise the aforesaid option and to consummate the purchase in accordance therewith during the eleventh year of the within lease, the Lessee's rights hereunder and the purchase option herein given shall have no further force and effect.* [emphasis added]

Subsequent to entering into the lease, plaintiff considered increasing the size of the building, and by a letter to the State dated October 31, 1967, informed the State that the architectural plans were in the final stages, and that it was considering adding two stories to the then contemplated eight stories. It offered the State a right of first refusal to utilize the proposed additional space, and it concluded by saying:

In view of the above, we hereby request that the State of New Jersey agree to amend paragraph 25 of the existing lease which will provide for the increased cost in the maximum option price.

Plaintiff does not claim that it received a response to this letter.

Plaintiff ultimately decided to construct a nine story building rather than a ten story building. Despite plaintiff's earlier letter request and decision with respect to an increase in the size of the building, on February 9, 1968, it entered into an

addendum to the lease, the sole substantive provision being that:

Anything in this lease to the contrary notwithstanding and with particular reference to Paragraph Twenty-fifth of the within lease, the right of the Tenant-Lessee, the State of New Jersey to exercise its option as defined in Paragraph Twenty-fifth of the within lease shall remain in full force and effect, and the option rights granted by said Paragraph Twenty-fifth shall cease and terminate after the eleventh year of the within lease.

Subsequently, on June 23, 1971, some fifteen months after the State's occupancy of the building, the parties executed a further addendum to the lease which established the commencement date for the obligation to pay rent and for the lease term:

[A]nything in the lease to the contrary notwithstanding, the Lessee agrees to pay to the lessor and the Lessor shall be entitled to receive as rental for the demised premises set forth in said lease an annual rental of One Million Eighty-Nine Thousand Five Hundred Ninety-Four and 50/100 ($1,089.594.50) Dollars, payable in equal month installments on the first day of each month during said term commencing on March 1, 1970, plus an additional sum of Twenty-Seven Thousand Nine Hundred Forty-Six ($27,946.00) Dollars for the rent of six floors of said building (3 to 8 inclusive) for the period from 2/15/70 to 2/28/70 in the manner provided by the laws of the State of New Jersey governing the disbursement of public funds....[1]

That addendum concluded by stating:

FURTHER AGREED that all other terms and conditions contained in the aforesaid lease and other addenda thereto, not in conflict with this agreement, shall remain in full force and effect.

The signature page of the July 12, 1967 lease contained a space for the State Treasurer to sign the lease as being "[a]pproved in accordance with the provision of *R.S.* 52:34–8 and 52:34–9(c)." Although this signature line is blank in the

---

[1]With respect to the commencement date of the lease, paragraph Seventeenth of the original lease provides in part:

In the event that the said building shall not have been completed and possession delivered to Lessee by January 1, 1969, Lessor shall exercise all possible diligence to complete the said building and shall deliver possession to Lessee as promptly as possible thereafter and in that event the term hereof shall begin not as hereinabove provided, but on the first day of the month next following the delivery and possession of the said premises to the Lessee, and the term date hereof shall be correspondingly advanced to provide a leasehold term of twenty (20) years.

Accordingly, the commencement date of the lease was March 1, 1970.

copy of the lease included in the State's appendix, the then State Treasurer did affix his written approval thereto. The statutory reference is explained as follows. *N.J.S.A.* 52:34–6 provides:

> All purchases, contracts or agreements, the cost or contract price whereof is to be paid with or out of State funds shall, except as otherwise provided in this act, be made or awarded only after public advertisement for bids therefor, in the manner provided in this act.

*N.J.S.A.* 52:34–8 provides:

> Any such purchase, contract or agreement where the cost or contract price exceeds $2,500.00 may, with the written approval of the State Treasurer, be made, negotiated or awarded by the Director of the Division of Purchase and Property without advertising, when the subject matter thereof is that described in section 4 of this act [*N.J.S.A.* 52:34–9] or when the purchase, contract or agreement is made or awarded under the circumstances described in section 5 of this act [*N.J.S.A.* 52:34–10], in any manner which the director may deem effective to promote full and free competition whenever competition is practicable.[2]

*N.J.S.A.* 52:34–9(c) provides:

> Any such purchase, contract or agreement may be made, negotiated or awarded pursuant to section 3 of this act [*N.J.S.A.* 52:34–8] when the subject matter thereof consists of
>
> . . . .
>
> (c) The lease of such office space, office machinery, specialized equipment, buildings or real property as may be required for the conduct of the State's business. . . .

On May 12, 1978, a regular meeting of the New Jersey Commission on Capital Budgeting and Planning was held at which the State Treasurer, who is a member of the commission, was present. During the meeting, the Department of the Treasury requested $8 million to be used for the "[e]xercise of purchase option of Taxation Building." After "much discussion," the commission endorsed its staff's recommendation that "the purchase of the Taxation Building ... be funded in fiscal year 1979."

---

[2]Effective February 8, 1980, *N.J.S.A.* 52:34–8 was amended, but not in any way germane to the issues involved in this appeal.

On August 22, 1979, Earl Josephson, the Special Assistant in charge of the New Jersey Division of Purchase and Property in the Department of the Treasury, wrote to Louis Graff, who is one of the partners in plaintiff's partnership. In his letter Josephson first discussed plaintiff's June 6, 1979, offer for "a new lease at a rental and term to be negotiated, with ownership vesting in the State at expiration, in lieu of the State exercising its purchase-option under the lease." Josephson indicated, however, that the State needed data on plaintiff's operating costs so it could make "a valid comparison between the effect of such a lease and State ownership" and noted that plaintiff had been "reluctant" to give such data. Consequently, Josephson concluded his letter of August 22, 1979 with the following statement:

> Therefore, it is our intent to proceed with plans to exercise the purchase-option under paragraph 25 of the lease dated July 12, 1967, as amended on February 9, 1968, and June 23, 1971, during the 11th year of the lease, beginning on March 1, 1980. This will serve as the required notice of the lessee's intention to exercise the option, at least 180 days prior thereto, as provided in the lease.
>
> It is understood, however, that we remain open to any precise and complete offer of a renegotiated lease which will be at least as beneficial to the State as ownership.

Josephson's letter of August 22, 1979, bears only his signature. However, the copy notation at the letter's foot indicates that a copy was sent to the then State Treasurer.

On September 10, 1979, Graff wrote to Josephson acknowledging receipt of his letter of August 22, 1979, and suggested a meeting in order to discuss "the various possibilities that might be suitable."

On February 26, 1980 and March 17, 1980, Josephson and Graff exchanged letters concerning possible terms for a new 30-year lease. On June 30, 1980, the act making appropriations for the fiscal year July 1, 1980 to June 30, 1981 was approved. *L.*1980, *c.* 56. It contained a $7,900,000 appropriation designated for "Purchase Taxation Building" and became effective on July 1, 1980.

On September 25, 1980, Graff wrote to Josephson requesting a meeting "to confer about an equitable adjustment, in view of the ultimate construction of a larger building than originally contemplated in the lease, dated July 12, 1967." On October 29, 1980, Josephson wrote to Graff in reply and noted that more than a year had passed since his letter of August 22, 1979, notifying plaintiff "of the State's intention to exercise this option," and in that time "no alternatives to the purchase option meeting the criteria of my August 22, 1979, letter have been identified which are acceptable to both parties." Josephson therefore expressed his opinion that "we have exhausted the 'alternatives' stage" and announced the State's intention "to proceed with the consummation of the purchase option per the lease." He then advised Graff that the State had secured its appraisal and was prepared "to proceed with the next step of the acquisition process," which required plaintiff to designate its appraiser. Consequently, Josephson asked plaintiff to advise him of the name of its appraiser and to designate a meeting date within the next 30 days "so that we may proceed to establish the purchase price of the building per the lease." On November 24, 1980, Graff sent Josephson a letter advising him of the name of plaintiff's appraiser and indicating that he would contact Josephson as soon as he received plaintiff's appraisal.

On January 8, 1981, plaintiff instituted this action in the Law Division against the State, seeking a declaratory judgment. In count one, plaintiff alleged the following:

> The notice of intent to exercise the option to purchase under Paragraph 25 of the Agreement which the Leassee [*sic*] purported to give on or about August 22, 1979 was defective and without legal efficacy in that the legislative approval and budgetary appropriation required by statute had not been obtained as of the August 22, 1979. In the absence of the requisite legislative approval and appropriation, the notice of August 22, 1979 was ineffective and void.

Although not specifically designated in its complaint, plaintiff was relying on two of the statutory provisions quoted hereinbefore: *N.J.S.A.* 52:34–8, which provides that a "purchase, contract or agreement" where the cost or contract price ex-

ceeds the statutory limit "may, *with the written approval of the State Treasurer,* be made, negotiated or awarded by the Director of the Division of Purchase and Property ... without advertising, when the subject matter thereof is that described in ... [*N.J.S.A.* 52:34-9] ..., and *N.J.S.A.* 52:34-9(d), which provides that any such purchase, contract or agreement "may be made, negotiated or awarded" pursuant to *N.J.S.A.* 52:34-8 when the subject matter thereof consists of

> ... (d) the acquisition of any real property by gift, grant, purchase or any other lawful manner in the name of and for the use of the State for the purpose of the administration of the State's business *in accordance with appropriations made therefor when monies are required for the acquisition....* [emphasis added]

Plaintiff concluded count one with a demand for judgment declaring that the State's right to exercise the purchase option had terminated, and determining that the State had no legal or equitable right to compel plaintiff to convey the building to the State.

In the second count, plaintiff alleged that the 11th year of the lease began no later than February 15, 1980, and, therefore, asserted that the State's August 22, 1979 notice of intent to exercise the purchase option was defective because not given at least 180 days prior to February 15, 1980. Consequently, plaintiff demanded the same relief set forth in count one.

In the third count, plaintiff alleged that the State's notice was not properly delivered to it. In the fourth count, plaintiff alleged that it had constructed a "substantially larger and more elaborate structure than was initially contemplated at the time the option price of $7,900,000 was negotiated" and asserted that an inequity would result if the State were allowed to rely on the $7,900,000 maximum option price. Therefore, since the option did not "properly relate" to the premises to be conveyed thereby, plaintiff contended that it was null and void. In the third and fourth counts, plaintiff demanded the same relief as it did in the first two counts.

In the fifth count, plaintiff alleged that the State would be unjustly enriched "if it received more property than was contracted to be sold under the Option contained in the Agreement of July 12, 1967, without any increase in the option price." Therefore, plaintiff demanded a judgment declaring the $7,900,-000 maximum option price "equitably amended to reflect the additional costs and value of constructing space and betterments in excess of those contemplated in the Agreement of July 12, 1967."

On February 18, 1981, the State filed its answer to the complaint in which it denied all of the material allegations set forth. Among its defenses, the State asserted that any non-compliance by the State "with any conditions in the agreement" was not substantial, was acquiesced in by plaintiff, and did not prejudice plaintiff.

The State answered and filed a counterclaim in which it alleged that paragraph twenty-fifth of the lease provided that the State was to "invoke its right to purchase by a notice of intent to exercise the option to purchase"; that, by way of Josephson's August 22, 1979 letter, the State had given plaintiff "formal notice of its intent to exercise the purchase option," and stated that the State was "ready, willing and able to consumate [sic] a purchase of the land and building" but had been prevented from so doing by plaintiff's refusal to participate in the market value calculation procedures specified in paragraph twenty-fifth. Therefore, the State demanded a judgment confirming the $7,400,000 market value figure calculated by its appraiser as the purchase price to be paid pursuant to paragraph twenty-fifth or, in the alternative, directing plaintiff to participate in the market value calculation procedures set forth in the lease. Plaintiff's answer, if any, to the State's counterclaim is not included in the record.

On October 9, 1981, the State filed a motion for summary judgment seeking dismissal of plaintiff's complaint, compelling plaintiff to convey the Taxation Building to the State for

$7,290,000, and awarding the State damages in the amount of $32,400 per month from February 28, 1981, until the building was conveyed to the State. In support of its motion, the State relied on the May 22, 1981 appraisal report of the court-appointed umpire; the affidavit of Robert Keating, Chief of Management Services for the Division of Taxation, in which Keating stated that the building had not been ready for occupancy by the State until February 21, 1970, and an affidavit of Josephson. In his affidavit, Josephson stated (1) that the State Treasurer had approved the lease dated July 12, 1967, and the amendment addenda dated February 9, 1968 and June 23, 1971, and (2) that the $7,900,000 appropriation for the building's purchase had been requested on August 30, 1979 (8 days after Josephson's August 22, 1979 notice of intent letter to plaintiff) and had been granted effective July 1, 1980.

On November 18, 1981, plaintiff filed a cross-motion for summary judgment (1) determining that the State had failed to exercise properly its purchase option because "at the time of exercise of the option," the State had not obtained either the written approval of the State Treasurer for the purchase or a legislative appropriation therefor; (2) declaring the State's purchase option expired and void, and (3) dismissing the State's counterclaim.

On December 4, 1981, both motions were argued before a Law Division judge. The judge stated that there was a factual dispute as to exactly when the building "was occupied or could have been occupied [by the State]" and, therefore, noted that it could not be resolved by way of summary judgment whether the State had exercised its option more than 180 days prior to the beginning of the 11th year of the lease. He also ruled that it was then unnecessary for him to delve into the reasons why plaintiff wanted to "get out" of going through with a sale to the State under the purchase option. Consequently, he directed both counsel to confine their arguments to the question "whether or not the exercise of the option by the State of New Jersey was a valid exercise of an option." Specifically, the judge

limited argument to two issues: (1) On August 22, 1979, had the written approval of the State Treasurer been obtained, and (2) Had an appropriation been secured as of that date?

The State argued that both the Legislature and the State Treasurer had approved the initial 1967 lease "with all the terms clearly set forth" and, therefore, the purchase option contained therein was "validated at the time of the entry of the lease in 1967." It maintained that once the lease had been approved in writing, the Director of the Division of Purchase and Property did not have to "go back twice" and get a second approval from the State Treasurer in order to exercise the lease's purchase option. Consequently, it was the State's position that "the option ... was duly and properly exercised ... by virtue of the August 22, 1979 letter sent by Mr. Josephson to ... [plaintiff]."

Counsel for the State conceded that no appropriation had been secured by August 22, 1979, but asserted that *N.J.S.A.* 52:34–9(d) only provides that the appropriation "is required when needed" (i.e., during the "exercise period of the option," which period was during the 11th year of the lease). According to the State's position, the 11th year began on March 1, 1980 and, therefore, the $7,900,000 appropriation (secured effective July 1, 1980) was "made within that eleventh year of the lease within the exercise period."

At the conclusion of the hearing the judge gave an oral decision in which he found: first, that the State Treasurer had approved the initial 1967 lease containing the purchase option and the 1968 and 1971 addenda amending the lease in writing; second, that as of August 22, 1979, no written approval of the State Treasurer to the exercise of the right to purchase under the option had been obtained, and third, that as of August 22, 1979, no appropriation had been obtained from the Legislature for the purchase of the subject building.

He decided that under *N.J.S.A.* 52:34–8, the written approval of the State Treasurer was mandatory and the State Treasur-

er's previous written approvals of the lease and the addenda thereto were "not tantamount or sufficient to be considered approval of the exercise of the option." Also, that the State's obligation to pay the option purchase price was "created when the option is exercised," and that *N.J.S.A.* 52:34–9(d) "very specifically" stated that "you shall have an appropriation before you contract" and, therefore, the necessary appropriation had to have been obtained by the time the State exercised its option on August 22, 1979. As of that date, no appropriation for the purchase of the subject building had been obtained.

Having found that, as of August 22, 1979, the State had not obtained either the necessary written approval of the State Treasurer to the exercise of the option or the necessary appropriation, the judge held that the State's attempted exercise of the option was invalid. In view of his finding on these two issues, the judge said it became unnecessary for him to resolve the remaining issues presented. Accordingly, he granted plaintiff's cross-motion for summary judgment.

The State first contends that the "notice of Lessee's intent to exercise the option" granted in paragraph twenty-fifth of the lease was a "mere condition precedent to the exercise of the option," which did not subject the State to any liability that caused *N.J.S.A.* 52:34–8 and 52:34–9(d) to become applicable. The State points out that *N.J.S.A.* 52:34–8 requires that contracts exceeding the statutory price limit "made without the benefit of public advertisements for bids must be approved by the State Treasurer as the senior purchasing official of the State" and notes that *N.J.S.A.* 52:34–9 is "intended to protect the fiscal integrity of the State, by insuring that the State does not undertake commitments not funded by existing appropriations." However, the State argues that neither statutory requirement is "necessary or applicable unless and until the State enters into a commitment which gives rise to a liability or debt."

The State next argues that its August 22, 1979 notice of intention to exercise the option did not constitute the "actual exercise of the option," nor did it create an obligation on the part of the State to "actually exercise the option" in the future. To the contrary, even after having sent its August 22, 1979 notice, the State points out that it still could have opted not to consummate the purchase and would have suffered no penalty therefor, except the loss of its option rights. Consequently, prior to the issuance of its August 22, 1979 notice, neither the written approval of the State Treasurer nor an appropriation was required. The State contends that these two statutory requirements did not have to be complied with until "the actual exercise of the option, when the State would acquire the building and undertake to pay the purchase price therefor."

The controlling question here is, under the terms of the lease, when and how was the purchase option to be exercised? An optionee can accept the owner's offer to convey embodied in the option only "by exercising the option in strict accordance with its terms and within the time designated." *State v. New Jersey Zinc Co.*, 40 *N.J.* 560, 576 (1963).

It is generally held that where an option specifies the manner and time in which it is to be exercised, such terms must be strictly adhered to by the optionee in accepting the offer embodied in the option. *Ibid.; Fry v. Doyle,* 151 *N.J.Super.* 115, 122 (Law Div.1977), rev'd on other grounds 167 *N.J.Super.* 486 (App.Div.1979), certif. den. 81 *N.J.* 287 (1979); 17 *Am.Jur.* 2d, *Contracts,* § 60 at 396. Here, however, the manner and time for exercise of the purchase option is not specifically set forth in the lease. Paragraph twenty-fifth merely provides (1) that, during the 11th year of the lease, the State "shall have the option to purchase the land and building"; (2) that, notice of the State's "intent to exercise the above option" had to be given at least 180 days prior to the commencement of the lease's 11th year, and (3) that, if the State failed "to exercise the aforesaid purchase option and to consummate the purchase in accordance

therewith during the eleventh year of the within lease," the State's rights under the purchase option would have "no further force and effect."

In cases where the manner of exercising the purchase option is not specified in the option itself, notice of its "unqualified" acceptance by the optionee ordinarily serves to create a binding, bilateral executory contract of sale (as in the case of a conventional offer of sale and its unconditional acceptance by the offeree). *West Caldwell v. Caldwell,* 26 *N.J.* 9, 26 (1958); *Martindell v. Fiduciary Counsel, Inc.,* 133 *N.J.Eq.* 408, 410–411 (E. & A. 1942); *Lakewood Tp. Mun. Util. v. S. Lakewood Water Co.,* 129 *N.J.Super.* 462, 470 (App.Div.1974); 6 *Williston, Contracts* (3 ed. Jaeger 1962), § 887BB at 530–531. For example, the option in *Lakewood Tp. Mun. Util.* did not specify how it was to be exercised, but the court indicated that, once the optionee had notified the optionor that it intended to exercise its purchase option, a binding contract came into effect. 129 *N.J.Super.* at 470. In *Lincoln Highway Realty v. State,* 128 *N.J.Super.* 35 (Ch.Div.1974), a paragraph of the lease provided that the State's purchase option was "exercisable only during the sixth year of the term of the Lease Agreement." The Director of the Division of Purchase and Property attempted to exercise the option during the 6th year by sending the plaintiff-landlord a letter, which he said was to serve "as formal notice that the State of New Jersey intends to exercise the purchase option in accordance with ... paragraph [36] for the sum of $250,000.00." 128 *N.J.Super.* at 38. The court observed that if the State had complied with the requirements of *N.J.S.A.* 52:34–8 and 52:34–9(d) before the Director sent the notice letter, the plaintiff-landlord would have been entitled to specific performance of the purchase option. *Ibid.* The reason for denying such relief was not based on a finding that the notice letter did not constitute the exercise of the option, but on the court's determination that under the factual circumstances at the time the Director sent his notice letter, he had no authority to exercise the option, because he had failed first to

obtain the State Treasurer's written approval and the necessary appropriation. 128 *N.J.Super.* at 39–41.

 In this case, as noted, Josephson sent his letter to Graff on August 22, 1979 in which he advised him that it was the State's "intent to proceed with plans to exercise the purchase-option under paragraph 25 of the lease," and informed Graff that his letter was "to serve as the required notice of the lessee's intention to exercise the option, at least 180 days prior thereto [*i.e.*, prior to the beginning of the lease's 11th year], as provided in the lease." Josephson closed that letter with the specific caveat that it should be "understood by Graff that the State [remained] open to any precise and complete offer of a renegotiated lease which will be at least as beneficial to the State as ownership."

We cannot see how this letter could be said to represent an *unqualified* exercise of the purchase option. In any event, the parties clearly did not treat it as such. Immediately after August 22, 1979, neither party initiated any of the required appraisal procedures, but instead began to exchange a series of letters concerning possible terms for a new 30-year lease.

It was not until October 29, 1980 that Josephson sent the letter to Graff in which he advised him that the stage for discussing "alternatives to the purchase option" had been "exhausted" and notified him that it "is the State's intention to proceed with the consummation of the purchase option per the lease." We find that it was at this point that the State notified plaintiff of its *unqualified* exercise of the purchase option.

It follows then that the August 22, 1979 notice of intention did not create a liability, debt or obligation on the part of the State, and therefore the notice did not require the written approval of the Treasurer under *N.J.S.A.* 52:34–8, and did not require a preexisting appropriation under *N.J.S.A.* 52:34–9(d). Consequently, there can be no question with respect to the State's compliance with the requirements of *N.J.S.A.* 52:34–9(d)

since, effective July 1, 1980, a $7,900,000 appropriation for the purchase of the subject building had been adopted.

We turn next to the argument that the State did not comply with *N.J.S.A.* 52:34–8 which provides that the Director of the Division of Purchase and Property may, "with the written approval of the State Treasurer," contract to purchase real property without following the statutory bidding procedures. The State admits that there is no written document signed by the State Treasurer specifically indicating his approval of the State's exercise of the purchase option. The State contends, however, that the Treasurer "verbally" approved the State's exercise of the option before the August 22, 1979 notice of intention was sent and, in addition, that there are various "writings" which reflect the Treasurer's approval of the exercise of the option, although all writings which allegedly indicate the Treasurer's tacit approval of the *exercise* of the option do not bear the Treasurer's signature.

Plaintiff argues that under *N.J.S.A.* 52:34–8, the written approval of the State Treasurer is an absolute prerequisite for the Director of the Division of Purchase and Property to contract to acquire realty. It points out that in the only reported decision construing this aspect of *N.J.S.A.* 52:34–8, *Lincoln Highway Realty v. State*, 128 *N.J.Super.* 35 (Ch.Div. 1974), the court held that the "plain and unambiguous mandate" of *N.J.S.A.* 52:34–8 was that "the power of the Director to award contracts without competitive bids comes about only under carefully specified circumstances, and only where the designated official of cabinet rank confers his written approval." 128 *N.J.Super.* at 40. The court went on to state that this requirement of the Treasurer's "approval" was "not merely a matter of form," but was a condition whose "fulfillment is vital to the very conception of any power in the Director to contract for the acquisition of property except after a public solicitation of bids." *Id.* at 40–41.

One of the first principles of statutory construction is that "the spirit of the legislative direction prevails over its terms." *Dvorkin v. Dover Tp.*, 29 *N.J.* 303, 315 (1959). On many occasions, the Supreme Court has observed that in interpreting a statute, "primary regard must be given to the fundamental purpose for which the legislation was enacted" and has cautioned that, in situations where a literal reading leads to a result not in accord with the essential purpose and design of the statute, the spirit of the law must control its letter. *N.J. Builders, Owners and Managers Association v. Blair*, 60 *N.J.* 330, 338–339 (1972). The court has said that statutory construction does not turn only on "literalisms," but also justly turns "on the breadth of the objectives of the legislation and the commonsense of the situation." *J.C. Chap. Prop. Owner's & c. Assoc. v. City Council*, 55 *N.J.* 86, 100 (1969). The Court has emphasized that a statute's "particular terms are to be made responsive to the essential principle of the law," because it is "not the words but the internal sense of the act that controls." *San-Lan Builders, Inc. v. Baxendale*, 28 *N.J.* 148, 155 (1958).

Statutes such as *N.J.S.A.* 52:34-6 *et seq.* which require competitive bidding reflect a legislative purpose to preserve to the State all the economic benefits of full and free competition and to guard against favoritism, improvidence, extravagance and corruption in the awarding of contracts, and are enacted for the benefit of the taxpayers and are to be construed with sole reference to the public good. *See Hillside Twp. v. Sternin*, 25 *N.J.* 317, 322 (1957). In recognition that the general inexpedience of the competitive bidding safeguard might sometimes outweigh these benefits, the Legislature in enacting *N.J.S.A.* 52:34-8 created a provision sanctioning departures from the statutory bidding procedures where defined justifications appeared. In those narrowly defined cases, the acquiescence of the State Treasurer is substituted to serve the protective function provided by competitive bidding as a condition of the Director's power to contract on behalf of the State.

By requiring his approval, the Legislature clearly intended to protect the public interest by drawing upon the judgment of the State Treasurer and validating the transaction only upon compliance with the judgment of the Director.

The end sought by the Legislature in enacting *N.J.S.A.* 52:34–8 was to secure the State Treasurer's prior approval, not his prior *written* approval. The requirement that the Director act only with the "written approval" of the State Treasurer was simply the means chosen by the Legislature to assure that the Treasurer's judgment was, in fact, drawn upon and to evidence that he had, in fact, concurred in the Director's action.

In this case the State Treasurer approved in writing the initial 1967 lease containing the purchase option and the 1968 and 1971 amending addenda. On May 4, 1978, a staff memorandum was sent to all members of the State Commission on Capital Budgeting and Planning, one member of which is the State Treasurer, which contained the recommendation that "the State exercise its purchase option on the Taxation Building," because the option's exercise "will generate cost avoidance savings of approximately $760,000 per year over the life of the building." In addition, the commission's staff recommended that "the purchase of the Taxation Building ... be funded in fiscal year 1979." On May 12, 1978, a meeting of the commission was held at which the State Treasurer was present. After much discussion, it endorsed both the request of the Department of the Treasury for $8 million to be used to exercise the purchase option on the Taxation Building, and the staff recommendation that the purchase be funded in fiscal year 1979. Josephson sent his notice of the State's intent to exercise the purchase option to Graff on August 29, 1979, and a copy of that notice was sent to the Treasurer. Thereafter, the Treasurer was copied on several letters concerning a proposed new 30-year lease. Effective July 1, 1980, the $7,900,000 appropriation to purchase the Taxation Building became effective, and was set forth in the State's "Appropriations Handbook" for "Fiscal Year 1980–81," which was jointly authorized by the Treasurer

and the Director of the Division of Budget and Accounting. On October 29, 1980, Josephson sent a copy of his letter exercising the option to the State Treasurer.

■ Based on the above, we have no question that prior to the exercise of the purchase option, the Treasurer's judgment with respect thereto had been drawn upon, and he had given his concurrence to the decision to exercise. To hold as the trial court did, that the State's exercise of the option was invalid because the *written* approval of the Treasurer had not been first obtained would be to exalt form over substance, considering the factual setting here.

■ We find that a factual dispute exists with respect to the option purchase price which is defined in the lease to be the "just and true market value" of the land and building "at that time" (*i.e.*, "during the eleventh year of the written lease"). According to the State's appraisal of September 5, 1980, by Lynford L. Collins, this value is $7,400,000, apparently valuing the property as if free and clear of the State's lease. Plaintiff's appraiser (Stephen M. Segal) submitted an appraisal sometime in February 1981, which differed from Collins' appraisal. The amount of plaintiff's appraisal was not indicated in the appellate record. The court-appointed umpire, Richard N. Chaiken, issued an appraisal on May 22, 1981 in which he valued the market value of the land and building to be $10,250,000, free and clear of all leases, and $7,290,000, subject to the existing State lease as of July 1, 1980.

The State sought summary judgment compelling plaintiff to sell the land and building to it for $7,290,000 "free and clear of any and all obligations." In its cross-motion for summary judgment, plaintiff contended that paragraph twenty-fifth provides that the option price is supposed to be based on the "fee simple true market value" of the land and building, not the value of the premises as if subject to the State's lease.

We find the appellate record to be insufficient to resolve the apparent factual dispute as to the premises' market value.

Under paragraph twenty-fifth of the lease, the decision of the umpire together with any one of the other appraisers nominated shall be "final and conclusive." The appraisal report of the umpire does not specify with which, if either, of the parties' appraisers he agreed.

We reverse the judgment of the Law Division, and remand the cause for further proceedings with respect to the purchase price of the premises, consistent with this opinion. No costs.